STATE OF CONNECTICUT *v.* ALPHA NIMS

LOISELLE, BOGDANSKI, PETERS, HEALEY and PARSKEY, Js.

590

Argued November 7, 1979—decision released May 20, 1980

*E. Eugene Spear,* public defender, for the appellant (defendant).

*Ernest J. Diette, Jr.,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Domenick J. Galluzzo,* assistant state's attorney, for the appellee (state).

PARSKEY, J. In a trial to a jury the defendant was convicted of murder in violation of Public Acts 1973, No. 73-137 § 2 (General Statutes § 53a-54a). From the judgment rendered on the verdict the defendant has appealed. Although the defendant assigned eight errors only four have been briefed; the rest may, therefore, be considered abandoned. *Healy* v. *White,* 173 Conn. 438, 441, 378 A.2d 540 (1977). The defendant submits that the trial court erred in denying his motion to dismiss for failure of the state to grant a speedy trial and in denying his motion for a new trial based on a claim that the jury panels were selected in an improper manner.

The defendant also claims error in the court's failure to grant a mistrial after one of the jurors saw the defendant in leg-irons in a hallway outside the courtroom and in the court's admission of certain tape-recorded testimony. These issues will be discussed seriatim.

## I

The defendant was indicted on June 17, 1974, and entered a plea of not guilty two days later. On May 2, 1975, the defendant moved for an immediate trial. This motion was denied by the court, *Saden, J.,* without prejudice. On August 11, 1975, the defendant moved to dismiss the indictment for failure to grant a speedy trial. This motion was also denied without prejudice and the case was continued for trial to September 16, 1975. Jury selection began on September 30, 1975, and the defendant was convicted on October 24, 1975.

The sixth amendment guarantee of a speedy trial is a fundamental right applicable to the states through the fourteenth amendment of the United States constitution. *Klopfer* v. *North Carolina,* 386 U.S. 213, 223, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967). This right is also guaranteed by the Connecticut constitution, article first, § 8. In *Barker* v. *Wingo,* 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the United States Supreme Court rejected rigid standards for determining the precise point in time after which the accused's right would be deemed denied, but instead adopted a balancing test to be applied on a case by case basis. Four factors form the matrix from which an analysis of this relative right develops: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Id., 530; *State* v.

*McCarthy,* 179 Conn. 1, 5, 425 A.2d 924 (1979). As both of these cases indicate, none of these factors standing alone would demand a set disposition; rather it is the total mix which determines whether the defendant's right was violated. In this case we conclude that he was not denied his right to a speedy trial.

We do not agree with the defendant that a sixteen month delay is unreasonable per se. *State* v. *McCarthy,* supra. It is sufficiently long, however, to require an examination of the other factors that go into the balance. *State* v. *Brown,* 172 Conn. 531, 536, 375 A.2d 1024 (1977). The state offered no reason for the long delay aside from the congestion of the courts in Fairfield County. This is a "neutral reason" which does not excuse the delay, since the burden of bringing the defendant to trial quickly is on the state. *Barker* v. *Wingo,* supra, 531. Thus we have a sixteen month delay which is not deliberate but which is also not satisfactorily explained.

The third factor, the defendant's assertion of the right, appears to militate against the defendant's claim. He waited nearly eleven months to move for a speedy trial, and although this does not amount to a waiver of the eleven month delay, it does cast doubt on the defendant's desire for a speedy trial. The record contains no indication why the defendant waited this long to assert the right.

Finally, there is no showing of prejudice. The defendant concedes that he cannot point to any specific evidence that was not available because of delay or any specific injury caused by it. Nor does he point to oppressive conditions of incarceration which amount to punishment in violation of his due process rights as a pretrial detainee. *Bell* v.

*Wolfish,* 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). While we are not unmindful of the detrimental impact of lengthy pretrial incarceration on any accused; *Barker* v. *Wingo,* supra, 532; *State* v. *Brown,* 172 Conn. 531, 540, 375 A.2d 1024 (*Bogdanski, J.,* dissenting), cert. denied, 434 U.S. 847, 98 S. Ct. 153, 54 L. Ed. 2d 114 (1977); we must examine each case on its own facts. The record before us in this case does not support a claim of prejudice arising from lengthy incarceration.

In *State* v. *McCarthy,* supra, we recently held that a nineteen month delay was not a deprivation of the right to a speedy trial. There the state claimed that the case was very complex and there the defendant asserted his right from the beginning. The only difference between *McCarthy* and this case is that in *McCarthy* the state had some justification for the delay which is lacking here. We feel, however, that this was more than offset by the defendant's apparent acquiescence in the delay for eleven months. *State* v. *Orsini,* 155 Conn. 367, 378, 232 A.2d 907 (1967). On balance, therefore, we conclude that the defendant was not deprived of his constitutional right to a speedy trial.

## II

The defendant next contends that the court erred in denying his motion for a new trial. The motion was based on information the defendant received after the trial that the jury clerk had used an improper procedure in selecting panels for voir dire from the jury array. In its memorandum of decision denying the motion the court found that the jury clerk kept separate piles of jurors' cards for men and women, and that for the panel in this case he selected by lot from those separate piles. The

parties have also stipulated to these facts in this appeal. The court concluded that this procedure did not represent a systematic intentional discrimination on the ground of sex, but rather was the result of misguided zeal. While the clerk's motives may have been beyond reproach, we cannot agree with the court's conclusion that the selection process did not constitute an intentional discrimination because of sex. It is apparent from the finding that this practice was not only long standing but even continued for many months after the jury clerk was specifically ordered in another case to discontinue it. "If one factor is uniform in a continuing series of events that are brought to pass through human intervention, the law would have to have the blindness of indifference rather than the blindness of impartiality not to attribute the uniform factor to man's purpose. The purpose may not be of evil intent or in conscious disregard of what is conceived to be a binding duty. Prohibited conduct may result from misconception of what duty requires." *Cassell* v. *Texas,* 339 U.S. 282, 293, 70 S. Ct. 629, 94 L. Ed. 839 (1950) (Frankfurter, J., concurring). The separation of jury cards by sex was not accidental. However well intentioned, the separation was a conscious effort by the jury clerk to take a person's sex into account in the selection of the jury panel. It is in this context that we must address the constitutional implications of the clerk's action.

The defendant had a constitutional right to due process and to trial by jury. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison,* 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955). An esssential component of the right to trial by jury is the right to select a petit

jury from a representative cross section of the community. *Taylor* v. *Louisiana*, 419 U.S. 522, 528, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975). "These principles compel the conclusion that a State cannot, consistent with due process, subject a defendant to indictment or trial by a jury that has been selected in an arbitrary and discriminatory manner, in violation of the Constitution and laws of the United States." *Peters* v. *Kiff*, 407 U.S. 493, 502, 92 S. Ct. 2163, 33 L. Ed. 2d 83 (1972) (plurality opinion).

"The due process clause does not itself guarantee a defendant a randomly selected jury, but simply a jury drawn from a fair cross section of the community. A claim of denial of this due process right requires a showing that the jury selection process tended to exclude or underrepresent some discernable class of persons and consequently to defeat a fair possibility for obtaining a truly representative cross section." *United States* v. *Kennedy*, 548 F.2d 608, 614 (5th Cir. 1977); *United States* v. *Hawkins*, 566 F.2d 1006, 1014 (5th Cir. 1978). Nor is a proportionally represented jury constitutionally mandated. *Carter* v. *Jury Commission*, 396 U.S. 320, 330, 90 S. Ct. 518, 24 L. Ed. 2d 549 (1970); *Swain* v. *Alabama*, 380 U.S. 202, 208, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965). To the contrary, any effort to create a proportionally representative jury is constitutionally impermissible. *Cassell* v. *Texas*, 339 U.S. 282, 286–87, 70 S. Ct. 629, 94 L. Ed. 839 (1950). In *Shepherd* v. *Florida*, 341 U.S. 50, 54–55, 71 S. Ct. 549, 95 L. Ed. 740 (1951), the United States Supreme Court, on the basis of *Cassell*, reversed a state court decision which upheld the selection of a grand jury on the basis of proportional representation. The principle which evolves from these cases is that any attempt to stack a jury panel by

intentionally including or excluding any members of a discernable class runs afoul of both due process and the right to a jury trial. *United States* v. *Hawkins,* supra, 1015.

"[C]lassifications based on sex, like classifications based on race, alienage, and national origin, are inherently suspect and must therefore be subjected to close judicial scrutiny." *Frontiero* v. *Richardson,* 411 U.S. 677, 682, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973) (plurality opinion). While not subjected to the "strict scrutiny" analysis which occurs when a "suspect class" is involved, nevertheless, "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig* v. *Boren,* 429 U.S. 190, 197, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976). We can see no justification whatsoever for this classification according to sex especially in the light of the fact that the jurors were all to be sitting on the array for a month whether or not they were impaneled or chosen.

The jury clerk, for whatever reason, chose to segregate into two piles the cards for the men and the women on the jury array. This in itself shows a prima facie case of discrimination. *Avery* v. *Georgia,* 345 U.S. 559, 562, 73 S. Ct. 891, 97 L. Ed. 1244 (1953). The clerk went further, however, and decided how many men and how many women would be on a given panel.[1] While the clerk's system does

[1] We note in passing that the discrimination complained of in each of the jury selection cases cited occurred in the selection of the array. In this case the unlawful act occurred in the selection of panels from a lawfully selected array. This is a more oppressive form of discrimination since it diminishes the defendant's chances, on the very panels from which his jury was to be chosen, of having a representative cross section of the community from which to select his jury.

not exclude women, it is equally offensive to the constitution to limit proportionally the number of an identified group that will serve on a jury array or panel. *Cassell* v. *Texas,* supra.[2] The basis for selecting jurors simply cannot take gender into account. Id., 295 (Frankfurter, J., concurring).

The state contends that any error here is harmless because, in fact, most of the array was examined, and because the jury ended up being composed of seven men and five women. The end result, however, is irrelevant. It is the *method* of selection which offends the constitution. *Cassell* v. *Texas,* supra (Frankfurter, J., concurring). No harm or prejudice need be shown in an individual case. *Ballard* v. *United States,* 329 U.S. 187, 195, 67 S. Ct. 261, 91 L. Ed. 181 (1946). "It is in the nature of the practices here challenged that proof of actual harm, or lack of harm, is virtually impossible to adduce. . . . In light of the great potential for harm latent in an unconstitutional jury-selection system, and the strong interest of the criminal defendant in avoiding that harm, any doubt should be resolved in favor of giving the opportunity for challenging the jury to too many defendants, rather than giving it to too few." *Peters* v. *Kiff,* 407 U.S. 493, 504, 92 S. Ct. 2163, 33 L. Ed. 2d 83 (1972).

### III

In view of the fact that this case must be remanded for a new trial, it is desirable to comment briefly on the two remaining assigned errors. The defendant's claim that a mistrial should have been granted because he was seen in leg-irons by one

---

[2] While this case dealt with grand jury selection, the same principles apply in the selection of the petit jury. *Alexander* v. *Louisiana,* 405 U.S. 625, 626 n.3, 92 S. Ct. 1221, 31 L. Ed. 2d 536 (1972).

of the jurors in a hallway outside the courtroom needs no discussion here. The occurrence was fortuitous and inadvertent, and we have no reason to believe it will recur in the defendant's new trial.

IV

The final assigned error concerns the admission of a tape-recorded examination of a key state's witness while she was under hypnosis. The prosecution made no reference to this examination, and in colloquy with the court out of the presence of the jury it was clearly represented to the trial judge that the tape would not be a part of the state's case. On cross-examination the defense brought it into the case in one of its numerous attempts to suggest that the witness had been influenced by contact with others before she positively identified the defendant.

The clear import of defense counsel's questions concerning the witness' hypnotic interview in the midst of all this inference of suggestion was to dissipate the force of her identification of the defendant as the man she had seen outside the victim's house on the morning of the murder. The obvious purpose of the prosecutor in offering the tape was to dispel any inference that the witness' ultimate identification was influenced by suggestions made to her while she was hypnotized. Thus the admissibility of the tape depends neither on the reliability of hypnosis, nor on the truthfulness of any statements made while the witness was hypnotized, since the only purpose for which it was admitted was to allow the jury to decide if the later identification were in any way tainted by improper suggestions. Twice the judge instructed the jury that that was the only purpose for which the tape should be considered.

While redirect examination is generally limited to answering new facts drawn out on cross-examination; McCormick, Evidence (2d Ed.) p. 64; the admission of evidence in rebuttal is ordinarily within the court's discretion. *Reboni* v. *Case Bros., Inc.,* 137 Conn. 501, 508, 78 A.2d 887 (1951). Once the defendant "opened the door" to this area of inquiry by introducing the fact of hypnosis, the court had to choose whether to leave this inference of hypnotic suggestion dangling unanswered, or whether instead to let the jury decide for themselves if there was any suggestiveness in the interview. The choice made here was the correct one. See *State* v. *Roy,* 173 Conn. 35, 49–50, 376 A.2d 391 (1977); *State* v. *Grayton,* 163 Conn. 104, 109–110, 302 A.2d 246, cert. denied, 409 U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d 495 (1972).

There is error, the judgment is set aside and the case is remanded for a new trial.

In this opinion the other judges concurred.