STATE OF CONNECTICUT *v.* JAMES C. TILLMAN
(14085)

PETERS, C. J., CALLAHAN, COVELLO, BORDEN and BERDON, Js.

Argued September 26—decision released December 3, 1991

*Charles D. Ray,* special public defender, for the appellant (defendant).

*Jack W. Fischer,* deputy assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's

attorney, and *Edward Narus,* assistant state's attorney, for the appellee (state).

PETERS, C. J. In this criminal appeal, the principal issue is whether the defendant, James C. Tillman, has adduced sufficient evidence to demonstrate that the process of selecting his jury array was managed in an unconstitutionally discriminatory manner. The state charged the defendant with kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B), sexual assault in the first degree in violation of General Statutes § 53a-70 (a), robbery in the third degree in violation of General Statutes § 53a-136 (a), assault in the third degree in violation of General Statutes § 53a-61 (a) (1), and larceny in the second degree in violation of General Statutes § 53a-123 (a) (3).[1] After a jury trial finding the defendant guilty as charged, the trial court rendered a judgment sentencing him to a total effective term of forty-five years imprisonment. The defendant appealed to the Appellate Court, and

---

[1] General Statutes § 53a-92 provides in pertinent part: "(a) A person is guilty of kidnapping in the first degree when he abducts another person and when . . . (2) he restrains the person abducted with intent to . . . (B) accomplish or advance the commission of a felony . . . ."

General Statutes § 53a-70 provides in pertinent part: "(a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person, or (2) engages in sexual intercourse with a person under thirteen years of age."

General Statutes § 53a-136 provides in pertinent part: "(a) A person is guilty of robbery in the third degree when he commits robbery."

General Statutes § 53a-61 provides in pertinent part: "(a) A person is guilty of assault in the third degree when: (1) With intent to cause physical injury to another person, he causes such injury to such person or to a third person . . . ."

General Statutes § 53a-123 provides in pertinent part: "(a) A person is guilty of larceny in the second degree when he commits larceny as defined in section 53a-119 and . . . (3) the property, regardless of its nature or value, is taken from the person of another . . . ."

we transferred his appeal here in accordance with Practice Book § 4023. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. On the evening of January 21, 1988, at about 11 p.m., the victim finished her work at an insurance company in Hartford and moved her car from her company's garage to an outside parking lot on Columbus Boulevard so that it would be easier to retrieve later. After having gone to a bar with her supervisor and coworkers, she returned to the car with her supervisor at about 12:45 a.m. Her supervisor left after observing her start her car and put her car lights on.

In the process of backing the car up, the victim noticed that she did not have her seat belt on and that the driver's side door was not locked. As she stopped to remedy this situation, the defendant opened the driver's side door and attempted to enter her car. When she asked what he was doing, the defendant punched her in the face, then reached in and turned off the ignition. He then hit her again and pushed her over to the passenger side of the car. When she screamed and tried to get out through the passenger door, he reached over, locked the door and hit her several more times.

The defendant, thereafter, started the car, but could not keep it from stalling because he was unfamiliar with a standard transmission. Finally, after fifteen to twenty minutes, he drove out of the parking lot and, a few minutes later, parked in another small outside lot. He took the victim's purse and jewelry, and then sexually assaulted her. After rifling through her briefcase, he drove the car out of the lot. He then stopped the car and ran off with her purse.

The defendant does not challenge the sufficiency of this evidence, if believed by the jury, to sustain his convictions. He maintains, however, that he is entitled to

a new trial for three reasons: (1) the selection of jury panels was unconstitutionally discriminatory; (2) the trial court improperly instructed the jury on identification, consciousness of guilt, and the use of prior inconsistent statements; and (3) the trial court improperly ruled that the field notes of a police social worker were inadmissible as hearsay. To the extent that these claims are entitled to a plenary review, we conclude that they do not establish the defendant's right to a new trial.

I

The defendant's claim of unconstitutional discrimination in the selection of the jury array arose in the following factual context. During voir dire, after six jurors had been selected, a supplemental panel was called for the selection of two alternates. The defendant, a black male, complained that the composition of the panels was discriminatory because they contained no black males and only one resident of Hartford. He requested that the clerk send in a new panel that would be more representative of the defendant's race and residence. The trial court ruled that the motion was untimely unless counsel could present evidence that the clerk was choosing people improperly. Defense counsel replied that he had no such evidence, but would speak with the jury clerk.

Several days later, defense counsel advised the trial court that he had been told by the clerk that jurors were being routinely dismissed for economic hardship if they could provide documentation that their employers would not pay the difference between their daily jury pay of $10 and their normal wages. The clerk's reasons for doing this, according to counsel, were that forcing such individuals to serve on a jury would cause them economic disadvantage, and that the clerk felt that such economically disadvantaged persons would not make

good jurors. The clerk reportedly acknowledged that a disproportionate number of minorities would be excused on this basis.

The trial court overruled the defendant's objection to the makeup of the panels. After trial, in a motion for a new trial, the defendant reiterated his claim that the absence of black male jurors and of more than one Hartford resident on either panel violated his constitutional rights. The court denied the motion, noting that the six jurors who decided the case had been chosen before the issue was raised.

One basis for a constitutional challenge to the composition of a jury array is the standard set forth in *Duren* v. *Missouri,* 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979). "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." Once the defendant has established this prima facie case, the burden then shifts to the state to prove that the selection system resulting in a nonrepresentative array furthers a significant state interest. Id., 367–68; see *State* v. *McCarthy,* 197 Conn. 247, 250, 496 A.2d 513 (1985); *State* v. *Castonguay,* 194 Conn. 416, 421–22, 481 A.2d 56 (1984).

The defendant maintains that the *Duren* standard has been violated in his case because the jury selection process tended to exclude or underrepresent a discernible class of persons, namely, people who are not compensated by their employers during jury duty, and because these persons were systematically excluded in

the jury selection process. He also alleges that this discrimination produced an underrepresentation of blacks and Hartford residents from his panel.

A jury array that does not violate *Duren* by underrepresenting any distinctive group may nonetheless be challenged if unconstitutional criteria were used in selecting its members. In *State* v. *Nims,* 180 Conn. 589, 430 A.2d 1306 (1980), we ordered a new trial when the jury clerk had been shown to have divided the array cards from which the jury panels were to be chosen into separate piles for men and women. While this procedure did not result in the underrepresentation of either sex, we held that it did discriminate on the basis of sex. "[A]ny attempt to stack a jury panel by intentionally including or excluding any members of a discernable class runs afoul of both due process and the right to a jury trial." Id., 595–96. "The end result . . . is irrelevant. It is the *method* of selection which offends the constitution." (Emphasis in original.) Id., 597. The defendant argues that, as in *Nims,* his jury was selected according to unconstitutional criteria.

Before considering the merits of the defendant's claims under *Duren* and *Nims,* we must address the state's argument that the defendant's objection to the jury selection process was not timely raised. The state relies principally upon Practice Book § 842, which provides: "Any party may challenge an array on the ground that there has been a material departure from the requirements of law governing the selection and summoning of an array. Such challenge shall be made within five days after notification of the hearing or trial date, unless the defect claimed has arisen subsequent to the time required to make such motion."

The state's reliance on Practice Book § 842 is not persuasive. Concededly the defendant did not question the composition of the jury venire until six jurors had been

selected, but it was only the composition of the second panel of jurors that aroused his suspicion that there was a possibility that black males or Hartford residents were being systematically excluded. Although *State* v. *Ferraro,* 146 Conn. 59, 63, 147 A.2d 478 (1958), cert. denied, 369 U.S. 880, 82 S. Ct. 1155, 8 L. Ed. 2d 283 (1962), holds that "a challenge to the array comes too late if it is made after the verdict, even though the irregularity may not previously have been known," the defendant in this case called the irregularity to the attention of the court long before the jury was called upon to reach its verdict. Moreover, the irregularity in *Ferraro* was merely the failure to follow the procedural requirements of a statute: the names of the veniremen had been drawn by a deputy sheriff instead of a clerk. In this case, by contrast, the defendant has mounted a constitutional challenge to the validity of the jury selection process. See *State* v. *Nims,* supra, 593–97 (ordering a new trial when an unconstitutional method of jury selection is discovered after trial). Where a constitutional flaw is discovered and brought to the court's attention before jury selection is complete, and good cause can be shown for the defendant's failure to mount an earlier challenge, the Practice Book is not a procedural roadblock.[2]

We therefore shall consider in turn the defendant's claims under *Duren* and *Nims.* The defendant makes two claims under *Duren:* first, that his right to a representative array was violated because some persons

---

[2] Because Connecticut now assembles jury panels only on the day of trial; see General Statutes § 51-238a; broad construction and strict application of the rule of *State* v. *Ferraro,* 146 Conn. 59, 63, 147 A.2d 478 (1958), cert. denied, 369 U.S. 880, 82 S. Ct. 1155, 8 L. Ed. 2d 283 (1962), might in some cases make it impossible for counsel to object to the array "within five days after notification of the hearing or trial date," since the array might not yet exist at that time. If the defect claimed were deemed to "arise" on the day of trial, on the other hand, the express exception in the last sentence of the Practice Book section would apply.

were excluded on the basis of the arrangement by which their employers compensated them; second, that because of this exclusion, blacks and Hartford residents were underrepresented on his panel.

The defendant's first *Duren* claim relies principally on *Thiel* v. *Southern Pacific Co.*, 328 U.S. 217, 66 S. Ct. 984, 90 L. Ed. 1181 (1946), which held that a federal jury panel was unlawfully constituted when a clerk and a jury commissioner intentionally and systematically excluded persons who worked for a daily wage.[3] The clerk's stated reason for the exclusion was similar to that alleged here: " 'The minute that a juror is called into court on a venire and says he is working for $10 a day and cannot afford to work for four, the Judge has never made one of those men serve, and so in order to avoid putting names of people in who I know won't become jurors in the court, won't qualify as jurors in this court, I do leave them out. . . . Where I thought the designation indicated that they were day laborers, I mean they were people who were compensated solely when they were working by the day, I leave them out.' " Id., 222. The result of this procedure was that "business men and their wives constituted at least 50% of the jury lists." Id. The court held impermissible this "wholesale exclusion of a large class of wage earners," and declared that "[j]ury competence is not limited to those who earn their livelihood on other than a daily basis," and that "the pay period of a particular individual is completely irrelevant to his eligibility and

---

[3] *Thiel* v. *Southern Pacific Co.*, 328 U.S. 217, 66 S. Ct. 984, 90 L. Ed. 1181 (1946), was not a constitutional case. The court reversed the judgment "in the exercise of our power of supervision over the administration of justice in the federal courts." Id., 225. However, the United States Supreme Court has since construed *Thiel's* fair cross-section requirement to be demanded by the sixth amendment and by the due process clause of the fourteenth amendment. *Taylor* v. *Louisiana*, 419 U.S. 522, 527, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975); *Peters* v. *Kiff*, 407 U.S. 493, 500 n.9, 502, 92 S. Ct. 2163, 33 L. Ed. 2d 83 (1972) (plurality opinion).

capacity to serve as a juror." Id., 223, 225. "The American tradition of trial by jury," the court stated, "necessarily contemplates an impartial jury drawn from a cross-section of the community." Id., 220.

In this case, however, the defendant has not made out a prima facie case of unconstitutional jury selection because he has not offered sufficient evidence to satisfy the *Duren* test. The defendant bears the burden of making an adequate record to support a challenge to a jury array. *State* v. *Mack,* 197 Conn. 629, 635 n.6, 500 A.2d 1303 (1985); *State* v. *Frazier,* 185 Conn. 211, 218, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982). All that this defendant ever offered to the court in support of his request for a new supplemental panel was his counsel's hearsay representations of a conversation he had had with the clerk. The defendant did not offer the clerk's own testimony or any other testimony. He did not request an evidentiary hearing to support his claims, or a continuance in order to gather probative evidence. A challenge to a jury array will fail if the defendant presents no evidence to the court. *State* v. *Acquin,* 187 Conn. 647, 681, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983). A representation by counsel does not meet this evidentiary requirement. *State* v. *Aillon,* 202 Conn. 385, 391, 521 A.2d 555 (1987).

To satisfy his evidentiary burden under the first part of *Duren's* three part test, the defendant would have had to establish the discriminatory exclusion of a "distinctive group." While there is no precise definition of the term "distinctive group"; *Lockhart* v. *McCree,* 476 U.S. 162, 174, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986); such a group must have, first, " 'some factor which defines and limits the group' "; second, " 'a basic similarity in attitudes or ideas or experience which is present in members of the group and which cannot be

adequately represented if the group is excluded from the jury selection process' ''; and third, '' 'there must be a possibility that exclusion of the group will result in partiality or bias on the part of juries hearing cases in which group members are involved.' '' *State* v. *Haskins,* 188 Conn. 432, 438, 450 A.2d 828 (1982), quoting *United States* v. *Guzman,* 337 F. Sup. 140, 143–44 (S.D.N.Y. 1972). *Thiel* established that the requirement of distinctness can be satisfied by a group that has been excluded on the basis of the arrangements by which its members are paid by their employers.[4] In so holding, however, the United States Supreme Court appears to have taken judicial notice that those who are paid by the day tend to be "persons of low economic and social status." *Thiel* v. *Southern Pacific Co.,* supra, 223–24. There is no such clear implication of economic and social status for those whose employers will not pay them the difference between their jury salaries and their regular income. The group is broad enough to include both the day laborers considered in *Thiel* and highly paid professionals, and this court could do no more than guess at the proportions of each. This we decline to do. In order to satisfy the first prong of *Duren,* then, the defendant had to offer some further evidence that the persons excluded were a "distinctive" group. For example, evidence that the group included disproportionate numbers of city dwellers or black males, as the defendant suggested, might have been helpful in building his case.

[4] The state emphasizes that here, unlike *Thiel* v. *Southern Pacific Co.,* 328 U.S. 217, 66 S. Ct. 984, 90 L. Ed. 1181 (1946), the alleged exclusion is voluntary. This is, however, irrelevant to the question whether the defendant has been denied the representative jury that is his right. See *Duren* v. *Missouri,* 439 U.S. 537, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979). The state argues that *Duren,* which invalidated an exemption that was presumed if females did not respond to the summons, is distinguishable because in the procedure alleged by the defendant, each juror had to act voluntarily and provide proof of his or her claim. A blanket exemption for women would not, however, become permissible if each woman were required to apply for the exemption and provide proof of her sex.

The defendant has similarly failed to meet the second or third requirements of the *Duren* test. He did not even allege the proportion of jurors who were actually excused for economic hardship. While the procedure that counsel described to the court did involve a systematic exclusion and might well have exceeded the clerk's statutory authority,[5] no proof was offered that that procedure was in fact followed. The defendant's second *Duren* claim, which alleges racial and geographical discrimination, fails for the same reason.

We next turn to the defendant's alternate claim under *Nims.* The defendant correctly observes that *Duren* is not the only standard for determining the validity of a jury selection process. In *State* v. *Castonguay,* supra, in which we followed the three-part *Duren* test,[6] we did not overrule or modify our analysis in *Nims.* See also *State* v. *McCarthy,* 197 Conn. 247, 250, 254, 496 A.2d 513 (1985), citing both *Castonguay* and *Nims.*

Under *Nims,* even if there is no underrepresentation of any group, it is possible for the jury to be selected according to unconstitutional criteria. The sex-based

[5] There is no merit to the state's claim that the practice complained of was authorized by General Statutes § 51-217 (c) (2). That statute does not say, as the state contends, that the administrator may excuse jurors for "financial hardship." The statute provides that the jury administrator may determine "whether any person may be excused for extreme hardship." Under the practice alleged by the defendant, even a de minimis burden would have been grounds for excusing a juror. "Jury service is a duty as well as a privilege of citizenship; it is a duty that cannot be shirked on a plea of inconvenience or decreased earning power. Only when the financial embarrassment is such as to impose a real burden and hardship does a valid excuse of this nature appear." *Thiel* v. *Southern Pacific Co.,* 328 U.S. 217, 224, 66 S. Ct. 984, 90 L. Ed. 1181 (1946).

[6] *Duren* had already been adopted in earlier decisions of this court. See *State* v. *Haskins,* 188 Conn. 432, 436, 450 A.2d 828 (1982); *State* v. *Acquin,* 187 Conn. 647, 681, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983); *State* v. *Frazier,* 185 Conn. 211, 216–17, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982).

classification in question in *Nims* had, however, been previously held by the United States Supreme Court to constitute a distinctive group both in the specific context of jury selection; *Duren* v. *Missouri,* supra; *Ballard* v. *United States,* 329 U.S. 187, 193–94, 67 S. Ct. 261, 91 L. Ed. 181 (1946); and as a suspect classification that must be subjected to heightened judicial scrutiny under the equal protection clause of the fourteenth amendment. *Craig* v. *Boren,* 429 U.S. 190, 197, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976); *Frontiero* v. *Richardson,* 411 U.S. 677, 682, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973) (plurality opinion). *Nims* relied on the latter series of cases to invalidate the challenged procedure because it could not be shown to " 'serve important governmental objectives and . . . be substantially related to achievement of those objectives.' " *State* v. *Nims,* supra, 596, quoting *Craig* v. *Boren,* supra, 197. Far from relaxing the first requirement of *Duren,* our decision in *Nims* relied on a finding that a suspect classification had been employed.

As an evidentiary matter, it is more difficult to establish that a classification is suspect than it is to show that a group is "distinctive" under *Duren.* See *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U.S. 432, 445–46, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). As we have already noted, the defendant in this case offered no supporting evidence of any kind to establish his claim of unconstitutional discrimination. The trial court therefore did not err in denying the defendant's motion.

## II

The defendant next claims that the trial court, in its instructions to the jury: (1) improperly failed to give his requested charge on the effect of physical impairment on the credibility of eyewitness testimony; (2) gave an improper charge on consciousness of guilt; and

(3) improperly failed to limit the jury's use of a prior inconsistent statement. We are not persuaded that any of these claims requires us to order a new trial.

A

The defendant submitted a request to charge that, in assessing the credibility of eyewitness testimony, the jury "may consider . . . whether the witness was physically impaired or under stress when observing the perpetrator." This charge was directed at the credibility of the victim, whose capacity for accurate observation the jury might reasonably have found to have been somewhat impaired at the time of the incident. There was evidence at trial that, before the attack, the victim had been drinking. As a result of the attack, she received a cut on her left eyebrow that bled and later required seven stitches. Her left eye began to swell during the attack, and later closed completely. The entire left side of her face was swollen after the attack. Her right eye eventually became black and blue. Because she was hit in the nose, she suffered a nosebleed. Despite this evidentiary foundation for the request to charge, the court did not comply literally with the defendant's request.

The trial court might appropriately have given the requested instruction. The court was not, however, required to charge the jury in the exact language of the request to charge, as long as the instructions given to the jury provided proper guidance for the jury's deliberations. *State* v. *Bunkley,* 202 Conn. 629, 658, 522 A.2d 795 (1987). Although the court did not use the phrase "physically impaired," it informed the jury that, in determining whether to credit a witness' testimony, it must assess the witness' "ability to observe facts correctly." The court further said that among the factors the jury was to consider was the witness' "degree of stress" and "her opportunity to observe the person."

These instructions adequately alerted the jury to the factors that it had to assess in determining the reliability of the victim's testimony.[7]

Even if the court's instructions were less informative on the risks of misidentification than they might have been, the issue is at most one of instructional error rather than of constitutional error. A new trial would only be warranted, therefore, if the defendant could establish that it was reasonably probable that the jury was misled. *State* v. *Shifflett*, 199 Conn. 718, 754, 508 A.2d 748 (1986). The record does not sustain such an assertion.

The evidence supporting an inference of visual impairment was far from overwhelming. The victim testified that she could see out of both eyes, and she never said that she had any difficulty viewing her attacker. During much of the fifty minutes that she was with him, they were in well-lighted areas. There were street lights on Columbus Boulevard, where the car was parked when the attacker entered it, and there were floodlights on an adjacent building. When the attacker forced the victim back into her car, his face was directly in front of hers and she was able to get a good look at his face. During the entire fifteen to twenty minutes that the attacker was having difficulty starting the car, the victim observed the right side of his face. She tried to look at him as much as possible as the car passed under the street lights of Columbus Boulevard. Because her left eye had been hurt, she held her right arm against her right eye to protect it. Because the area where the car stopped was well lit, the victim was able to view her attacker. She testified that she "was trying to focus on his eyes, nose, the shape of his face, things that I could remember, things that I would be able to use to

---

[7] At summation, counsel for the defendant was permitted without objection to expound at some length his argument that the victim's vision was impaired and that the defendant was a victim of mistaken identity.

identify him by." His nose was particularly distinctive, "[k]ind of like a hook nose." The street he drove the car onto after the sexual assault was also well lit. After the attacker fled, the victim could not see very well out of her left eye, but her right eye was unaffected. When the police arrived she told them that she was certain she could identify her attacker, and she readily picked the defendant's photograph from a properly assembled array. When she was shown the first mug shot of the defendant, she correctly noted that he seemed younger in the photograph. She testified that there was no doubt in her mind that the defendant was the man who had attacked her.

Given this positive identification testimony, and the instruction that was given, we conclude that it is not reasonably probable that the jury was misled by the court's refusal to charge in the specific language that the defendant had requested.

### B

The defendant's second challenge to the jury instruction focuses on the court's statement that: "There is a legal principle of law known as consciousness of guilt, and it applies when a defendant says or does an act which one can infer that he had attempted to avoid detection or to avoid facts which would lead to his conviction. Here again, *this principle would apply* to the defendant's statements to Detective Kumnick when questioned how he got the lacerations which were healing on the major knuckles of his hand." (Emphasis added.) According to the testimony of Detective Stephen Kumnick of the Hartford police department, when the defendant was arrested and charged with assault and sexual assault, he had visible bruises and lacerations on his hands. When asked how he had gotten these cuts, he first responded that he was not sure, and then said that he had gotten them while working

at a car wash. Further inquiry from Kumnick led the defendant to remark, "I didn't get those from punching no girl." At this time, no one had told the defendant that the victim had been beaten by fists.[8] At trial, the defendant denied having made the statement, and also testified that at the police station he was shown a picture of the victim's battered face.[9] The jury was instructed that it first had to determine that the statement was actually made. If it was made, the jury could draw "reasonable inferences" from it.

The defendant contends that the emphasized portion of this instruction removed from the jury's consideration the possibility that his statement was made on the basis of innocent beliefs or motives. Since his motivation in making the statement was properly a question for the jury to consider, he argues, the instruction impaired his constitutional right to a jury trial.

A jury charge in which the court removes from the jury's consideration an issue that is one of the essential elements of the crime, and thereby relieves the state of the burden of proving every element beyond a reasonable doubt, would violate the holding of *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979). Although the defendant never filed a request to charge or objected to the charge that was given, he now maintains that his complaint is of constitutional magnitude and therefore reviewable under *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973), and

---

[8] At summation, the state argued that the defendant could not have known that the woman was punched with someone's fists unless he had done it.

[9] During final argument, defense counsel argued that the defendant's remark, if it had actually been made, might have been prompted by the defendant's viewing of a picture of the victim. The defendant also argues for the first time on appeal that he could have inferred that the victim was beaten with fists after being informed that he was charged with sexual assault and assault and after seeing the attention that was paid to the cuts on his hands. This new argument should have been made to the jury and now comes too late.

*State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989). We disagree. An instruction about consciousness of guilt is not so directly related to an essential element of the crime as to warrant plenary discussion of whether "the claim is of constitutional magnitude alleging a violation of a fundamental right." *State* v. *Golding,* supra, 239–40; see *State* v. *Smith,* 219 Conn. 160, 166, 592 A.2d 382 (1991).

## C

In his third challenge to the validity of the jury charge, the defendant maintains that the trial court improperly instructed the jury about a prior inconsistent statement allegedly made by Gwendolyn Wilson, an alibi witness for the defendant.[10] The court informed the jury that, if it found that Wilson had said something contradictory to her trial testimony in an earlier conversation with Detective Kumnick, and the prior statement was "not in writing or recorded on tape, it may only be used to test the witness's credit and may not be substituted for her testimony." The defendant now claims that, because Wilson's recollection at trial was refreshed by reading statements attributed to her in Kumnick's written report, the jury might have been misled into giving substantive weight to her earlier statements.

We need not decide this question because the defendant did not raise this claim below. See Practice Book § 852. There is no merit to the defendant's argument that this instruction unconstitutionally deprived him

---

[10] Gwendolyn Wilson testified that on the night of the crime, the defendant spent the night at her house. On cross-examination, she denied that she had spoken to the police a few days after the crime. The state attempted to refresh her recollection by showing her a copy of Detective Kumnick's report of his conversation with her, but she still did not remember any conversation with police. Kumnick then testified that he spoke with Wilson six days after the crime, and that she had told him that she was positive that the defendant had not been at her house on the night of the offense.

of a fair trial. "Patently nonconstitutional claims that are unpreserved at trial do not warrant special consideration simply because they bear a constitutional label. . . . For example, once identified, unpreserved evidentiary claims masquerading as constitutional claims will be summarily dismissed." (Citations omitted.) *State* v. *Golding,* supra, 240–41.

## D

The defendant finally claims that because these instructions concerned the essential element of identity and were related to the portions of testimony that were most damaging to him, taken together they deprived him of a fair trial. We are unpersuaded. We are aware of no case, and the defendant has cited none, that holds that a group of instructional claims of error, each of which has individually been found not to constitute reversible error; see *State* v. *Harris,* 182 Conn. 220, 230–33, 438 A.2d 38 (1980); should be aggregated to form a separate basis for a claim of a constitutional violation of a right to a fair trial. We decline to create a new constitutional claim in which the totality of alleged constitutional error is greater than the sum of its parts.

## III

The defendant's last contention is that the trial court improperly excluded from evidence the field notes of Janette Getz, a police department social worker, in which she had recorded a pretrial conversation with Kumnick to the effect that fingerprints had been found on the driver's side of the victim's car, but that they did not belong to the defendant. At the trial, Kumnick testified that the fingerprints found on the car did not belong to the defendant. He identified the location of the fingerprints, however, as being in the area of the

passenger door. The victim testified that her attacker had entered and exited the car from the driver's side. The defendant offered the field notes as a business record, in an attempt to persuade the jury either that the unknown prints were actually on the driver's door or that the police investigation was faulty. The court sustained the state's objection, and the defendant duly excepted. On appeal, the defendant urges, alternatively, that the notes were also admissible as a prior inconsistent statement of Kumnick that might have been used to attack his credibility in various other critical parts of his testimony.

Our review of the trial court's ruling excluding the field notes "is limited to the specific legal ground raised in the objection." *State* v. *Sinclair,* 197 Conn. 574, 579, 500 A.2d 539 (1985); see Practice Book §§ 4185, 288. The statement in the notes that is attributed to Kumnick would have been inadmissible as hearsay, because it was "[a]n out-of-court statement . . . offered to establish the truth of the matters contained therein"; *State* v. *Sharpe,* 195 Conn. 651, 661, 491 A.2d 345 (1985); unless it came within the exception for business records. "To gain admission of a document under the business record exception to the hearsay rule, the proponent must show that (1) the document was made in the regular course of business, (2) it was the regular course of business to make such a record, and (3) the record was made when the act, transaction or event occurred, or shortly thereafter." *State* v. *Damon,* 214 Conn. 146, 156–57, 570 A.2d 700, cert. denied, 490 U.S. 1069, 111 S. Ct. 65, 112 L. Ed. 2d 40 (1990). To qualify a record as a business entry, the party offering the evidence must present a witness who testifies that the three requirements have been met. Id. The defendant made no attempt to lay a proper foundation for the admission of the notes, even after the trial court pointed

out this requirement. We conclude, therefore, that the trial court correctly excluded the field notes from evidence.

The judgment is affirmed.

In this opinion CALLAHAN, COVELLO and BORDEN, Js., concurred.

BERDON, J., dissenting. I disagree with the majority's rejection of the defendant's claim that the trial court erred in refusing to allow him to present evidence in support of a challenge to his jury array. I would find, on the basis of the offer of proof made by the defendant, that he was entitled to an evidentiary hearing to attempt to make a prima facie showing that the jury array was derived in an unconstitutional manner through the adoption of a practice that resulted in the exclusion of minorities, including black persons. Accordingly, I would reverse the judgment in this case and remand the same for a new trial.

In this criminal prosecution, the state charged the defendant, James C. Tillman, a black man, with the crimes of sexual assault, kidnapping, robbery, larceny and assault of the victim, a white female. Jury selection began on September 5, 1989, and the first panel was drawn from an array consisting of fifteen persons, all of whom were white except for two black females who were bank employees.[1]

After the first panel was exhausted at the end of the day on Thursday, September 7, 1989, a second panel of ten persons was drawn, all of whom were white. After one person on the second panel was questioned,

[1] One black female potential juror, a resident of Hartford, was excused as a result of the state exercising a peremptory challenge. The other black female potential juror, a resident of Bloomfield, was excused as a result of the defendant exercising a peremptory challenge after his cause challenge was denied.

the defendant objected to its composition because neither of the two panels, both of which contained twenty-five persons, included any black males and because only one person was from Hartford. The defendant requested that the second panel be dismissed and that a new panel be drawn.[2] The trial court rejected the request and implicitly invited counsel to ascertain if there was "evidence that the jury clerk is calling in people improperly or excusing them improperly or sending them down other than randomly." Jury selection continued for part of the day on Friday, September 8, and a total of six white jurors were selected.

On Monday, September 11, prior to the selection of the alternates, the defendant renewed his objection to the composition of the jury panel. Counsel read a prepared statement from the defendant objecting that the composition of the panels failed to include black males and Hartford residents.[3] After reading the statement of the defendant, counsel furnished the court with an offer of proof that included the following: "As the court knows, the jurors are selected from a combination of motor vehicle records and voting lists. Also, a factor that is used by the jury clerks in this judicial district, in deciding whether or not to exclude a person from jury duty . . . [is] an economic factor. If the jury clerk for this district, Your Honor, for this building, has documentation that a person called for jury duty who is

[2] Mr. Cosgrove, the attorney for the defendant, stated: "[W]e've had, two panels, we've gone through one completely, 15 people, we just introduced a new panel of 10 people, there hasn't been a single black male among those 25 people, your Honor. I don't know if that's representative of the entire jury pool here but I don't think it comports with Mr. Tillman's right to a trial by a jury of his peers and in addition, your Honor, there has been only one Hartford resident from my count on this sheet here and that happened to be a black woman who was excused by the state. I just would request the court to ask the jury clerk to send a new panel down here that might be more representative of Mr. Tillman's race and place of residence."

[3] See infra, 515.

employed somewhere will not be given the balance of his or her pay by his or her employer, and therefore would only be receiving the ten dollars a day that the state provides the jurors, then the jury clerk will excuse that person for an economic hardship. This is a decision that is made by the jury clerk and there are two reasons that the jury clerk gave me for this: One is that it's economically disadvantageous to that potential juror to have to spend four weeks here making ten dollars a day when he or she—and therefore forfeiting a lot more that they would be paid on their job, if they happen to come from an employer who does not make up the difference. The other reason, Your Honor, is that the clerks feel that a person who is, in effect, forced to sit on jury duty for four weeks for ten dollars a day will not make a good juror. Now, I would submit that . . . this is not to be construed . . . as racial discrimination as such, but the fact is, according to the jury clerk here, that very often members of minorities are employed by employers who do not make up the difference in the ten dollar a day—the difference from the ten dollar a day that the state pays the jurors. *Therefore, the clerk agreed that there are a disproportionate number of minorities who would be excluded solely by the jury clerk for this economic hardship.* She told me, in fact, that on this particular panel, the array that is available upstairs, that in fact there are not many black jurors available." (Emphasis added.) The trial court again rejected the claim of the defendant giving as his reason "that six jurors were selected prior to the challenge having been made."[4] Thereafter, two white alternates were selected. The defendant was tried and convicted as charged by his all white jury.

---

[4] The defendant, after the verdict, renewed his objection to the arrays in a motion for a new trial, which was denied. The court again commented that the challenge was made "after the first six jurors had already been selected."

The issues raised by the defendant, which allege the exclusion of persons from jury service on the basis of race, go to the very heart of our system of criminal justice—the impartial jury. "The purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge." *Taylor* v. *Louisiana,* 419 U.S. 522, 530, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975).

The selection of a petit jury from a representative cross-section of the community is an essential element of the right. Id. There is, however, no constitutional right that the petit jury result in any particular composition. *McCray* v. *Abrams,* 750 F.2d 1113, 1128 (2d Cir. 1984), reh. denied, 756 F.2d 277 (2d Cir. 1985) (en banc). Not "every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community . . . ." *Thiel* v. *Southern Pacific Co.,* 328 U.S. 217, 220, 66 S. Ct. 984, 90 L. Ed. 1181 (1946). "Indeed the impracticability of attempting to achieve a petit jury composed of a cross section is obvious." *Williams* v. *Coppola,* 41 Conn. Sup. 48, 56, 549 A.2d 1092 (1986). Its composition, from the array to the jury panel, then becomes a question of the luck of the draw. The array, however, from which these panels are drawn must be composed of a representative cross-section of the community in order to allow the defendant a chance to achieve this result.

The thrust of the majority opinion denying the defendant's claim of unconstitutional discrimination in the selection of the jury array is that "[a]ll that this defendant ever offered to the court in support of his request for a new supplemental panel was his counsel's hearsay representations of a conversation he had had

with the clerk." The majority fails to acknowledge the basic trial procedure of an "offer of proof" as utilized by the defendant. Offers of proof are allegations by the attorney in which he represents to the court that he could prove them if granted an evidentiary hearing. See *Jacobsen* v. *Jacobsen,* 177 Conn. 259, 267, 413 A.2d 854 (1979). " 'An offer of proof, properly presented, serves three purposes. First, it should inform the court of the legal theory under which the offered evidence is admissible. Second, it should inform the trial judge of the specific nature of the offered evidence so the court can judge its admissibility. Third, it thereby creates a record adequate for appellate review.' " *State* v. *Conrod,* 198 Conn. 592, 597, 504 A.2d 494 (1986), quoting *Mad River Orchard, Inc.* v. *Krack Corporation,* 89 Wash. 2d 535, 537, 573 P.2d 796 (1978). Although counsel for the defendant did not articulate that he was presenting an "offer of proof," it is apparent from the record that the trial court understood it to be such an offer when it rejected the challenge to the jury array on the ground that six jurors have already been selected—in other words—it was too late to make the claim.[5] Accordingly, the defendant's constitutional challenge to the array must be reviewed as if these allegations of the defendant could had been proven at an evidentiary hearing.

The defendant made five basic allegations in his offer of proof and statement to the court. First, the jury clerk, in deciding whether she will excuse a person from jury duty, considers an economic hardship—that is, if the person's employer would not make up the difference between his or her regular wage and the $10 per

---

[5] I agree with the majority that, "[w]here a constitutional flaw is discovered and brought to the court's attention before jury selection is complete, and good cause can be shown for the defendant's failure to mount an earlier challenge, the Practice Book is not a procedural roadblock." Majority opinion, 494. In this case, as the majority found, the defendant's objections were timely.

diem jury fee paid by the state, that person would be excused; second, very often the excuse of persons on this economic criterion results in the exclusion of members of minorities including blacks because they are likely to be employed by those who do not make up the difference; third, this practice results in the exclusion of a disproportionate number of minorities including blacks; fourth, the array from which panels were selected in this case did not include many blacks; and fifth, the defendant claimed that the array from which the defendant's jury was selected was unconstitutionally constituted.

We have long held that "[i]mpartiality as a core requirement of the right to trial by jury is served not only by the sixth amendment, which applies to the states as well as to the federal government . . . but also by the due process and equal protection clauses of the fourteenth amendment." (Citations omitted.) *State* v. *Brigandi,* 186 Conn. 521, 542, 442 A.2d 927 (1982). Under either argument advanced by the defendant in this case[6]—a sixth amendment violation under *Duren* v. *Missouri,* 439 U.S. 357, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979), or a due process violation under *State* v. *Nims,* 180 Conn. 589, 430 A.2d 1306 (1980)—the defendant was entitled to an evidentiary hearing in order to prove that the composition of the array violated his constitutional right to select a jury from a representative cross-section of the community.

Under *Duren,* the defendant could have established, on the basis of his offer of proof, a prima facie case[7]

---

[6] Although the defendant appears also to raise state constitutional issues, his failure adequately to brief them by providing reasoned legal argument precludes appellate review. *State* v. *Hernandez,* 204 Conn. 377, 382, 528 A.2d 794 (1987).

[7] "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representa-

that the array did not satisfy the fair cross-section requirement. This would then have shifted the burden to the state to prove that the selection system furthered significant state interests. *Duren* v. *Missouri,* supra, 367–68. The defendant would have satisfied the "distinctive group" requirement by the proof that potential jurors were excluded for the economic reasons, which resulted in the exclusion of minorities including blacks;[8] *Thiel* v. *Southern Pacific Co.,* supra, 222 (intentionally eliminated all those who worked for a daily wage);[9] he would have satisfied the "representation of this group . . . is not fair and reasonable" requirement by proof that the practice resulted in a disproportionate number of blacks being excluded compared to their number in the community; and the "underrepresentation is due to systematic exclusion" requirement would have been satisfied by proof that this exclusion was the practice of the clerk in the judicial district of Hartford.

Likewise, proof of the defendant's offer would have established a violation of due process under *State* v.

---

tion of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren* v. *Missouri,* 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979).

[8] The majority claims the "group is broad enough to include both the day laborers considered in *Thiel* and highly paid professionals . . . ." Whether it includes those who are "highly paid" begs the issue. The issue is whether the elimination of the "distinctive group" results in the exclusion of minorities including blacks, which was included in the offer of proof.

[9] The United States Supreme Court has struck down jury selection schemes that have: (1) intentionally eliminated a racial group; *Smith* v. *Texas,* 311 U.S. 128, 130, 61 S. Ct. 164, 85 L. Ed. 84 (1940); (2) deliberately selected jurors from the membership of particular private organizations; *Glasser* v. *United States,* 315 U.S. 60, 86, 62 S. Ct. 457, 86 L. Ed. 680 (1942); and (3) intentionally eliminated women. *Ballard* v. *United States,* 329 U.S. 187, 195, 67 S. Ct. 261, 91 L. Ed. 181 (1946). As the defendant aptly noted in his brief, in each case the United States Supreme Court held that these practices were incompatible with the fair cross-section requirement that is the hallmark of trial by an impartial jury.

*Nims,* supra. " 'The due process clause does not itself guarantee a defendant a randomly selected jury, but simply a jury drawn from a fair cross section of the community. A claim of denial of this due process right requires a showing that the jury selection process tended to exclude or underrepresent some discernable class of persons and consequently to defeat a fair possibility for obtaining a truly representative cross section.' " Id., 595, quoting *United States* v. *Kennedy,* 548 F.2d 608, 614 (5th Cir. 1977).

*Nims,* however, makes clear that the practice does not necessarily have to exclude all those in the discernible class; "it is equally offensive to the constitution to limit proportionally the number of an identified group that will serve on a jury array or panel. *Cassell* v. *Texas,* [339 U.S. 282, 286–87, 70 S. Ct. 629, 94 L. Ed. 839 (1950)]." *State* v. *Nims,* supra, 597. Surely, the imposition of the economic criterion in this case of excusing potential jurors, which results in the exclusion of members of minorities including blacks, satisfies *Nims.*

Underscoring both the *Duren* and the *Nims* claims made in this case is the composition of the community. According to the 1990 national census, Hartford, the largest city included in the judicial district, has a total population of 139,739, which includes a black population of 39 percent.[10] Considering these statistics makes it even more likely that the practice of the jury clerk had an impact on the underrepresentation of blacks on the array.

In our system of justice, not only must the accused be afforded a fair trial, but equally important there must be a perception of fairness by the community and the accused. Anything less not only undermines the

---

[10] I take judicial notice of the 1990 census figure for the city of Hartford. *Nichols* v. *Nichols,* 126 Conn. 614, 621–22, 13 A.2d 591 (1940).

credibility of this branch of government but also threatens the very fabric of our democracy. And, of course, the perception that the person is being tried before a fair jury drawn from a cross-section of the community is high on the agenda in achieving that goal.

When a black man, as in the present case, is accused of serious crimes such as the sexual assault of a white victim, that black defendant—and, indeed, the black community—cannot perceive that he has received a fair trial from a jury that is entirely composed of white persons, drawn from an array made up of very few blacks because of deliberate practices that resulted in their elimination. The defendant in this case forcefully expressed that concern when his attorney read to the court during jury selection the following statement he had prepared. "Your Honor, I object to the jury array. I do not feel that this is a jury of my own peer[s] and therefore it will be impossible for me to have a fair trial. Especially considering the facts of the Danny Webb case which has been in all the news and newspapers.[11] And the fact that his case alleges that he [attacked] a middle class white woman from one of the suburban towns, which in fact is what my jury panel was made of. There were only two blacks from the entire panels in which I had to choose from. I'm sure that this [doesn't] comply with the statistical percentage of blacks for this geographical area. Therefore, this cannot be a jury of my peer[s] and [it] will be impossible for me to have a fair trial. I therefore state for the record at this time, I would like to challenge the jury array and ask the court to order whatever [is] necessary for me to do this."

---

[11] The defendant had made reference to a highly publicized case involving the arrest and arraignment of a black man for sexual assault and capital murder of a white female victim who was a downtown Hartford office worker. In the present case, the white female victim was also a downtown Hartford office worker.

There is a need to preserve public confidence in the fairness of a jury but that perception dissipates when the court, through its clerk, employs selection practices for the array that undermines the defendant's constitutional right to select a jury from a fair cross-section of the community. "Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Batson* v. *Kentucky,* 476 U.S. 79, 87, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

Accordingly, I respectfully dissent.